Receipt number AUSFCC-11236663

### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NATIVE CDFI NETWORK INC.,

*Plaintiff*,

v.

UNITED STATES OF AMERICA,

*Defendants*.

Case No. **26-646 C** _____

### <u>COMPLAINT</u>

1.      This case concerns multiple breaches of contract by the Environmental Protection Agency—each unprecedented in its own way—in connection with a $400 million grant to Plaintiff Native CDFI Network Inc (NCN).

2.      In 2022, Congress enacted legislation that provided $27 billion to EPA to make competitive grants under a new Greenhouse Gas Reduction Fund. Plaintiff applied for this funding to support its efforts to provide much-needed capital to community development financial institutions (CDFIs) serving Native communities, to enable those CDFIs to support important projects advancing clean energy, infrastructure, and economic development.

3.      In April 2024, after a rigorous review process, EPA awarded Native CDFI Network (NCN) a $400 million, multi-year grant under the Greenhouse Gas Reduction Fund's "Clean Communities Investment Accelerator" program. EPA and NCN entered into a grant agreement that specified NCN would deposit the full grant amount into an account in NCN's name at Citibank. Under the grant agreement, once the funds were deposited into NCN's primary account at Citibank, they were NCN's program income and property, and NCN could withdraw and use the funds as needed to carry out the award.

4.      The grant agreement authorized EPA to terminate the agreement only in limited circumstances—where NCN engaged in (i) substantial noncompliance with the terms and conditions of the award or (ii) "waste, fraud, material misrepresentation of eligibility status, or abuse." Moreover, under the agreement, EPA could not take control of NCN's grant funds in its accounts at Citibank unless EPA furnished the bank with a "Notice of Exclusive Control," which EPA could furnish only by issuing "a written determination and finding that [NCN] has failed to comply with the terms and conditions of the [grant agreement]."

5.      The grant agreement also included a self-executing Closeout Agreement. The Closeout Agreement is unambiguous that after the award ends, all funds remaining in NCN's primary Citibank account become NCN's "Post-Closeout Program Income," which NCN may keep and use for the same allowable purposes as when the award was active. The Closeout Agreement further specifies that, once the Closeout Agreement is triggered, NCN may transfer the funds from its primary Citibank account to a bank of NCN's own choosing.

6.      In the months following the award, NCN did everything it was required to do under the grant agreement. But beginning in February 2025, EPA took a series of actions to prevent NCN and the other Greenhouse Gas Reduction Fund recipients from accessing and using their award funds—sitting in their own bank accounts—as permitted under the contracts. First, EPA got the FBI to "request" that Citibank freeze the funds in NCN's accounts. EPA then had the Treasury Department directly order Citibank to do so. Shortly thereafter, EPA terminated NCN's award while maintaining the directive to Citibank to deny NCN access to its account. In the termination letter and court filings that followed, EPA invoked a potpourri of shifting reasons for the termination, before settling on the assertion that it terminated the awards because EPA's priorities had changed. EPA has maintained that assertion even though the grant agreement

makes clear that changed agencies priorities is *not* a ground upon which EPA may unilaterally terminate the award.

7.    NCN disputed the termination with EPA, but received no response from the agency for over a year. NCN's funds at Citibank, meanwhile, have remained unavailable ever since the government unlawfully instructed Citibank to freeze those funds in February 2025. NCN has since submitted all required closeout documents, resulting in the Closeout Agreement going into effect. Under the Closeout Agreement, NCN has a legal right to retain and use the funds in its Citibank accounts, but NCN continues to be denied access to those funds.

8.    EPA has breached its agreements with NCN in at least three ways.

9.    *First*, EPA breached the grant agreement by purporting to terminate NCN's award without any legal basis. EPA in litigation involving other Greenhouse Gas Reduction Fund grantees has disclaimed any notion that the grantees violated the terms of the agreements or engaged in waste, fraud, abuse, or misrepresentations. EPA instead maintains that it terminated the agreement based on new priorities, which the agreement indisputably did not permit. EPA's breach of contract in terminating the agreement has deprived NCN of, at a minimum, the $400 million in grant funds that the agreement promised to NCN to carry out its mission.

10.    *Second*, EPA breached the grant agreement by exercising control over NCN's accounts without issuing a Notice of Exclusive Control. The agreement is clear that EPA may exercise control over NCN's accounts only by issuing such a notice, but EPA has not done so, and there would be no basis for EPA to do so because NCN has not failed to comply with any of the terms and conditions of the award. As a direct result of EPA's breach of the, NCN has been without access to nearly $400 million held in a bank account in its own name.

11.    *Third*, EPA has now independently breached the Closeout Agreement by preventing NCN from retaining and using the funds remaining in its Citibank accounts. The Closeout Agreement is unambiguous that the funds remaining in NCN's Citibank accounts after the award ends belong to NCN as Post-Closeout Program Income. The Closeout Agreement is now in effect, and EPA has no lawful basis to continue to prevent NCN from accessing and transferring its funds. This breach, too, has deprived NCN of $400 million in Post-Closeout Program Income to which it is contractually entitled.

12.    In addition to breaching NCN's contract in multiple ways, the government's termination and instructions to Citibank to indefinitely freeze NCN's funds constitute an illegal exaction and a taking without just compensation.

13.    The government has insisted in separate district court litigation that grant recipients of the Greenhouse Gas Reduction Fund can and should seek damages in the Court of Federal Claims for EPA's breaches of contract and other actions. NCN files this action as the government itself has counseled.

## JURISDICTION

14.    This Court has jurisdiction pursuant to 28 U.S.C. § 1491.

## PARTIES

15.    Plaintiff Native CDFI Network (NCN) is a not-for-profit corporation.

16.    The United States of America is a defendant pursuant to 28 U.S.C. § 1491(a).

## FACTUAL ALLEGATIONS

**A.    Background on NCN**

17.    Founded in 2009, NCN is a not-for-profit corporation that represents and assists Native community development financial institutions (CDFIs) in at least 27 states with the

implementation of federal government programs for lending and investment activities in Indian Country.

18.     CDFIs are a public-private partnership designed to increase accessibility to affordable financial services and products. See Darryl E. Getter, Cong. Rsrch. Serv., R47217, Community Development Financial Institutions (CDFIs): Overview and Selected Issues at 1 (Sept. 29, 2023). In 1994, Congress created the "CDFI Fund" as part of the Riegle Community Development Regulatory Act of 1994. Once certified, CDFIs become eligible for financial awards and other assistance provided by the CDFI Fund to promote community development.

19.     NCN is a national voice and advocate for CDFIs that serve Native communities, working to provide them with access to capital so that they can implement important energy, infrastructure, housing, and economic development projects for Native communities across the United States. In the past three decades, such CDFIs have proven to be vital engines for fueling the growth of healthy, vibrant Native economies and communities. According to the Treasury Department, investments made in CDFIs produce an eight-fold return, with each $1 creating $8 in private sector investments.

20.     NCN serves Native trust land communities, American Indians, Alaska Natives, and Native Hawaiians. It is the only national membership organization of NCNs in the United States.

21.     As part of its mission, NCN regularly engages with federal agencies to receive grants and other forms of financing. These agencies include EPA as well as the Treasury Department, Department of Agriculture, the Administration for Native Americans, and the Small Business Administration.

**B.    The Inflation Reduction Act's Greenhouse Gas Reduction Fund**

22.    In 2022, Congress passed the Inflation Reduction Act, which included an amendment to the Clean Air Act to create the Greenhouse Gas Reduction Fund (GGRF) program. See Pub. L. 117-169 ("Inflation Reduction Act") § 60103, 136 Stat. 1818, 2065–66 (2022).

23.    The basic purpose of the GGRF was to leverage federal grant funds to mobilize private capital in support of clean energy and pollution reduction initiatives. Congress appropriated $7 billion to issue grants to promote "zero-emissions technology," *id.*, which EPA proceeded to use for a "Solar for All" program focused on solar power. As relevant here, Congress appropriated another $20 billion to EPA to issue grants to states, municipalities, Tribal governments, and other eligible recipients for direct and indirect investments in projects, technologies, and technical assistance to reduce greenhouse gas and other pollutant emissions, including in low-income and disadvantaged communities. *Id.*

24.    With this $20 billion in appropriations, EPA created two distinct grant programs: the National Clean Investment Fund (NCIF) and the Clean Communities Investment Accelerator Program (CCIA).

25.    EPA allocated $8 billion to the CCIA program. The CCIA was intended to provide federal financial assistance to low-income, disadvantaged communities (including tribal communities) by providing financing and technical assistance to those communities for emission-reduction projects and technical assistance.

26.    On July 14, 2023, EPA issued a Notice of Funding Opportunity for the CCIA. The purpose of this funding opportunity was to provide grants to a small number of hub nonprofits that would provide funding and technical assistance to specific industry networks of

6

public, quasi-public, not-for-profit, and nonprofit community lenders. The goal of the funding was to help ensure that every community in the country has access to the capital needed to deploy clean technology in their homes, small businesses, schools, and community institutions.

27.     The Notice of Funding Opportunity included a robust set of application requirements and evaluation criteria. Applicants were required to submit not only a detailed project narrative but also a long list of application attachments, such as organizational and governing documents, resumes of board members and senior management, legal and compliance risk management polices and procedures, financial statements, workplans for the first year of program implementations, and budget narratives.

28.     To apply for funding under the CCIA, applicants also had to show, among other things, that they had identified CDFI "community lenders" who would receive capitalization funding to make loans or investments in qualified projects and "coalition partners" who would help the grant recipients provide technical assistance to grant recipients and subrecipients.

29.     EPA established a rigorous process to review and select applications. That process included an evaluation of each program's plan, budget, organizational capacity, risk management program, internal controls, financial statements, and previous experience managing third-party capital. The review was conducted by expert panels who would then present rankings and recommendations to a selection official authorized to make the final selection for awards.

**C.    NCN Applies for and Receives a CCIA Grant**

30.     As an organization with extensive experience implementing financial and technical assistance to Native communities throughout the United States, NCN was uniquely qualified to pursue a grant under CCIA program.

31.     After working on its grant application for several months, on October 11, 2023, NCN submitted its application. The application included a detailed budget, and NCN also noted that it had recruited 63 community lenders who had committed to spend 100% of their capitalization funding on CCIA-eligible projects directly benefiting Native communities. NCN further explained how it had carefully selected coalition partners who would help it provide technical assistance to grant subrecipients.

32.     On March 31, 2024, following the agency's lengthy and rigorous review process, EPA selected NCN for a $400 million grant award, with a budget period and project period of July 1, 2024 to June 30, 2030.

33.     EPA issued a formal notice of award and grant agreement to NCN on August 8, 2024. *See* Ex. 1 (the "Original Grant Agreement"). The notice of award and Original Grant Agreement obligated the full $400 million award amount to NCN.

34.     The project description attached to the notice of award explained that NCN would use the grant funds to "finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of the community lenders to draw on that capital to catalyze development of clean energy projects in communities across the country—especially in communities that have long faced barriers accessing capital and that most need the benefits of clean technology projects." *Id.*, Attachment 1.

35.     In December 2024, EPA issued NCN and the other CCIA and NCIF recipients an amended grant agreement. *See* Ex. 3 (the "Grant Agreement" or the "Amended Grant Agreement"). The Amended Grant Agreement was largely the same as the Original Grant Agreement, except among a few other changes the Amendment Grant Agreement updated the termination language, as described below.

8

**D.      NCN's Grant Agreement**

36.      Under NCN's Grant Agreement with EPA, NCN was to make subawards to coalition partners and community lenders as subrecipients, who were then responsible to implement a portion of the grant award. The activities that NCN anticipated being funded through its community lender network included "rooftop and community solar installation, renewable microgrids, [and] the new construction and retrofitting of net-zero buildings in the proposed communities, including residential buildings, community houses, medical centers, and municipal buildings." *Id.*

37.      The Grant Agreement provides that "[t]he Period of Performance under this Award Agreement will end on the date specified in the Notice of Award," but "the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344." *Id.* at 43.

38.      Under the agreement, NCN could use grant funds to cover its direct costs associated with implementing the grant award, including personnel and operational costs. *Id.* at 3. The agreement further provided that NCN could withdraw up to $2,495,455 in indirect costs. *Id.*

39.      The Grant Agreement required NCN to adhere to rigorous reporting requirements. These included requirements to produce semiannual, annual, and final reports to EPA with detailed narratives describing program performance, submit semi-annual transaction-level and project-level data reports, and provide ongoing disclosures to EPA. *Id.* at 15–18.

40.      The Grant Agreement also contemplated that the government would later designate a "Financial Agent" for the GGRF, at which point NCN was required to set up a Deposit Account with the Financial Agent. *Id.* at 54. Once the Deposit Account was established,

the Grant Agreement provided that NCN "will drawdown the entire available EPA award balance from [Treasury's Automated Standard Application for Payments (ASAP) system] and disburse it into the Deposit Account, where it must be maintained until" closeout of the grant. *Id.* at 59. The agreement further provided that NCN would grant EPA a "security interest"—but not a property interest—in NCN's funds held in the Deposit Account. *Id.*

41.    In September 2024, EPA selected Citibank as the Financial Agent for all GGRF grants, including the CCIA grant to NCN. The Amended Grant Agreement issued on December 20, 2024 updated the agreement language to reflect that Citibank was the designated financial agent.

42.    The Grant Agreement provided for two types of "Program Income": (1) "Program Income from Operations," and (2) "Program Income from Capitalization by Nonexchange Capital Contribution." Ex. 3 at 56.

43.    Program Income from Operations "includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised)." *Id.*

44.    As for Program Income from Capitalization by Nonexchange Capital Contribution, that term was defined to mean that the full amount of award funds disbursed into NCN's "Budget Account" with the Citibank would become Program Income. The Grant Agreement defined "Capitalization by Nonexchange Capital Contribution" to mean "funds that

10

(1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities." *Id.* at 55. Under the agreement, "[t]he full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income" once such funds were deposited into NCN's Budget Account at Citibank. *Id.* at 55; *see also id.* at 56 ("Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition.").

  45. The Grant Agreement set forth limited situations in which EPA could issue a "Notice of Exclusive Control" over the funds in the Citibank account. Specifically, EPA could issue a Notice of Exclusive Control only if it:

> issues a written determination and finding that [NCN] has failed to comply with the terms and conditions of th[e] Award Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized under the terms of the Award Agreement.[1]

*Id.* at 58.

---

[1] The "Award Agreement" means "the set of legally binding documents between EPA and [Native CDFI] under the federal award." *Id.* at 8. It is used interchangeably with "Assistance Agreement."

**E.      The Account Control Agreement and Financial Agency Agreements**

46.      Upon selection of Citibank as Financial Agent, NCN negotiated and executed an Account Control Agreement with Citibank and EPA. *See* Ex. 2.

47.      Like the Grant Agreement, the Account Control Agreement also makes clear that NCN holds legal title to its funds at Citibank. It provides that Citibank "maintains the Accounts for [NCN]," and that NCN is "the entitlement holder with respect to all financial assets credited from time to time to the Accounts." *Id.* § 1(b). It also characterizes EPA as holding only a security interest in the funds, while citing New York's Uniform Commercial Code, *id.* at 1–2, which characterizes accountholders as holding the relevant property interest. *See* NYUCC Article 4 (governing bank deposit); NYUCC § 8-503(b) (property interest of entitlement holder).

48.      Under the Account Control Agreement, Citibank must follow all instructions from NCN "directing the disposition of funds and financial assets in the Accounts." The only exception is if the "Secured Party" (*i.e.*, EPA) issues a Notice of Exclusive Control, which, as noted, required "a written determination and finding" that NCN had failed to comply with the terms and conditions of the Grant Agreement.

49.      Citibank and Treasury separately entered into a Financial Agency Agreement in September 2024. The Financial Agency Agreement also recognized NCN's title to the funds. The agreement requires Citibank to establish "accounts in the names of the three NCIF and five CCIA grant recipients" and provides that each grantee and subgrantee "account holder will have the ability to access and use funds in their respective accounts," with EPA holding only a security interest in the accounts of the grantees.

12

**F.      The Grant Agreement Limited the Circumstances Under Which EPA Could Terminate**

50.      The termination provisions of the Original Grant Agreement and the Amended Grant Agreement reference the Uniform Grants Guidance issued by the Office of Management and Budget (OMB). *See* 2 C.F.R. part 200. The portions of the Uniform Grants Guidance related to terminations materially changed in 2024 as relevant to NCN's award.

51.      In 2020, OMB revised the Uniform Grants Guidance to permit agencies to terminate an award "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49559 (Aug. 13, 2020) (revising 2 C.F.R. § 200.340(a)(2)).

52.      On April 22, 2024, OMB revised this section to permit termination based on "program goals or agency priorities" only "pursuant to the terms and conditions of the Federal award"—if that potential ground for termination was "clearly and unambiguously" stated in the terms and conditions of the award. 2 C.F.R. §§ 200.340(a)(4), (b) (2024). OMB explained that under the revised § 200.340, agencies could terminate a grant based on new program goals or agency priorities "[p]rovided that the language is included in the terms and condition of the award." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024).

53.      OMB provided an effective date of October 1, 2024 for the 2024 version of the Uniform Grants Guidance, but OMB also specified that "Federal agencies may elect to apply the final guidance to Federal awards issued prior to October 1, 2024." 89 Fed. Reg. at 30046. EPA elected to avail itself of this option and moved up the effective date of the new guidance for its awards. On July 3, 2024, EPA announced in a Federal Register notice: "The revised version of 2 CFR 200.340 will apply to EPA financial assistance agreements awarded or amended to add

13

funds on or after July 3, 2024." Applicability Date for the Office of Management and Budget's

Regulatory Revisions, 89 Fed. Reg. 55262, 55263 (July 3, 2024).

54.     The Original Grant Agreement between EPA and NCN also referenced EPA's

then-General Terms and Conditions for EPA awards. The Original Grant Agreement stated: "The

Recipient agrees to comply with the current EPA general terms and conditions available at:

https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-

later." Ex. 1 at 6. EPA's 2023 General Terms and Conditions, then in effect, had termination

provisions consistent with the older 2020 version of the Uniform Grants Guidance. EPA General

Terms and Conditions Effective October 1, 2023, at pp. 2–3.

55.     However, the Original Grant Agreement expressly overrode that aspect of EPA's

General Terms and Conditions and limited EPA's right to terminate to the conditions set forth in

the 2024 version of the Uniform Grants Guidance, which EPA had adopted more than a month

prior in July 2024. The Original Grant Agreement's section on Termination provided in full:

> *Notwithstanding the General Term and Condition "Termination,"* EPA maintains
> the right to terminate the Assistance Agreement only as specified in 2 CFR
> 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1,
> 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the
> terms and conditions is substantial such that effective performance of the
> Assistance Agreement is materially impaired or there is adequate evidence of
> waste, fraud, material misrepresentation of eligibility status, or abuse, prompting
> adverse action by EPA per 2 CFR 200.339, through either a partial or full
> termination. If EPA partially or fully terminates the Assistance Agreement, EPA
> must (1) de-obligate uncommitted funds and re-obligate them to another Eligible
> Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42
> USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's
> Assistance Agreement to reflect the reduced amount, based on the de-obligation.
> In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of
> termination.

Ex. 1 at 42–43 (emphasis added).

14

56.     Subsequent to the Original Grant Agreement, EPA amended its General Terms and Conditions so that its termination section matched the 2024 version of Uniform Grants Guidance that EPA had adopted in July 2024. EPA's 2024 General Terms and Conditions thus only permitted terminations based on "programs goals or agency priorities" if that ground for termination was clearly and unambiguously set forth in the terms and conditions of an award.

57.     Thereafter, EPA issued the Amended Grant Agreement in December 2024, which among other things updated the wording of the Termination section to reflect the 2024 update to its General Terms and Conditions. Given that the Original Grant Agreement overrode the termination provisions of the prior 2023 General Terms and Conditions, and instead specified that the language in the new Uniform Grants Guidance would apply, this updated language solely provided clarity and did not materially change the circumstances under which EPA could terminate.

58.     The Termination section of the Amended Grant Agreement provides in full:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.960 (CCIA) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

Ex. 3 at 43.

59.    As described, under the 2024 version of 2 CFR § 200.340 applicable to EPA grants issued after July 3, 2024, EPA could terminate a grant on the ground that it "no longer effectuates the program goals or agency priorities" only if that ground for termination is "clearly and unambiguously" stated in the award's terms and conditions. 2 CFR § 200.340(a)(4), (b). EPA specifically ratified this understanding in its Federal Register notice making the 2024 version effective for EPA awards issued after July 3, 2024, with EPA stating: "OMB's final rule . . . revised 2 CFR 200.340(a)(4) to clarify that an agency may terminate a Federal award if it no longer effectuates the program goals or agency priorities (e.g. unilateral termination) but only when such language is clearly and unambiguously included in the terms and conditions of the award." 89 Fed. Reg. at 55263. Neither NCN's Original Grant Agreement nor the Amended Grant Agreement specified—"clearly and unambiguously," or otherwise—that EPA could terminate based on program goals or agency priorities.

60.    Consequently, under both the Original and Amended Grant Agreements, EPA could unilaterally terminate NCN's award only if NCN "fail[ed] to comply with the terms and conditions of the Federal award." 2 C.F.R. § 200.34(a)(1) (2024); *see also id.* § 200.339. EPA could not unilaterally terminate NCN's grant, under either version of the agreement, because it no longer effectuated program goals or agency priorities.

61.    Regulations incorporated into the grant agreements also required EPA to take certain procedural steps to terminate the award. Among other things, EPA had to comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341.

**G.      The Closeout Agreement within the Grant Agreement**

62.      The Grant Agreement defined "Post-Closeout Program Income" to include "Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement." Ex. 3 at 10. And as described, once NCN drew down funds from the ASAP system and those funds were deposited into NCN's Budget Account at Citibank, those funds became Program Income, meaning the full amount of funds in the account at the end of the Period of Performance is "Post-Closeout Program Income."

63.      The "Closeout Agreement" is provided for within the Grant Agreement. The Closeout Agreement was "self-executing" and "goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official." *Id.* at 44.

64.      The Closeout Agreement provides that subject to certain reporting requirements, "after the end of the Period of Performance of the Assistance Agreement, [NCN] may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income" for the same "Allowable Activities" for which NCN could use the funds while the award was open.. *Id.* Moreover, "[o]nce the Closeout Agreement goes into effect," NCN is "entitled to transfer any remaining funds in the Deposit Account [at Citibank] to an account at a financial institution of its choosing." *Id.* at 58.

65.      The Closeout Agreement does not terminate unless either "(1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement." *Id.* at 47.

**H.      EPA Freezes NCN's Funds and Terminates Its Grant**

66.      On February 12, 2025, EPA Administrator Lee Zeldin made a public statement announcing EPA's goal of taking possession of grant funds disbursed pursuant to the Inflation Reduction Act.[2] Administrator Zeldin stated that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" the grant funds.[3] Administrator Zeldin then stated that he would "refer[] this matter to the Inspector General's office and . . . work with the Justice Department," and that EPA was "not going to rest" until it had "recover[ed]" the grant funds.[4]

67.      According to public news reporting, EPA thereafter took multiple actions designed to suspend or terminate GGRF awards, including NCN's award, and cause Citibank to withhold funds from GGRF grantees. On February 17, 2025, the Office of the Deputy Attorney General at the Department of Justice communicated with the U.S. Attorney's Office in Washington, D.C., seeking to open a grand jury investigation into GGRF contracts awarded by

---

[2] Lee Zeldin (@EPALeeZeldin), X, at 1:40 (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.
[3] *Id.* at 2:15.
[4] Rapid Response 47 ((@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x.com/RapidResponse47/status/1894406216052289869.

EPA, including to NCN.[5] Denise Cheung, the Chief of the Criminal Division at USAO-DC, advised that there was no adequate factual basis to open that grand jury investigation. [6]

68.    On February 17, 2025, the FBI "recommended" to Citibank that it freeze assets in the accounts of GGRF grantees, including NCN .[7] The FBI did not rely on a warrant issued by a judge or articulate exigent circumstances justifying an immediate seizure of these funds without notice. And the FBI took this action even though Ms. Cheung had advised that there was not "sufficient evidence to tell the bank that there is probable cause to seize the particular accounts identified."[8]

69.    That same day, the Office of the Deputy Attorney General instructed that a second letter be sent to Citibank directing that the bank implement an asset freeze and refrain from releasing funds in the accounts of 28 other GGRF awardees and subawardees pursuant to a criminal investigation.[9] In response, senior officials at the U.S. Attorneys' Office again asserted that there was insufficient evidence to justify issuing the letter.[10] Ms. Cheung refused to send the letter and was forced to resign on February 18, 2025.[11]

70.    Without signoff from other prosecutors at the U.S. Attorneys' Office, Interim U.S. Attorney Ed Martin then submitted a seizure warrant application to a magistrate judge, which

---

[5] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/.

[6] *See Resignation Letter*, *supra* note 5 (stating that no "predicate for opening such a grand jury investigation existed" on the face of existing documents provided by ODAG).

[7] Exhibit 5 to Citibank's TRO Opposition, *Climate United v. Citibank, N.A.*, No. 25-cv-698 (D.D.C. Mar. 12, 2025), Dkt. 14-5.

[8] *Resignation Letter*, *supra* note 5.

[9] *Id.*; *see* Exhibit 5 to Citibank's TRO Opposition, *supra* note 5, at 5–6.

[10] *Resignation Letter*, *supra* note 5.

[11] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI Takes Up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dcmdva/2025/02/27/trump-fbi-epa-grant-investigation/.

19

was rejected. The Office of the Deputy Attorney General then reportedly sought a different U.S. attorney's office to carry out the warrant request in order to launch a grand jury investigation and obtain a court-ordered bank freeze, but prosecutors in that office likewise refused to do so.[12]

71.     On February 21, NCN's CEO emailed Citibank, noting that NCN had "recently bec[o]me aware of a temporary pause or freeze on NCN Network's accounts." NCN requested that Citibank explain the reasons for its actions and how it aligned with the terms of the relevant contracts.

72.     Later that same day, NCN's contact at Citibank responded, "We are continuing to evaluate the current situation and will come back to you as soon as we can."

73.     On February 24, 2025, NCN contacted Citibank again to request information as to why it could not access its funds. Citibank responded, "We do not have an updated status at this time and continue to monitor the situation with EPA for status updates once they become available."

74.     On March 2, 2025, EPA Deputy Administrator W.C. McIntosh sent a letter to EPA's Office of Inspector General asking for an OIG investigation into GGRF funding.[13] EPA then sent a copy of that letter to Citibank by email, asserting that the letter "highlights several of the egregious instances of misconduct regarding $20 billion GGRF distributions that have been improperly funneled through your financial institution," and stating that "EPA will continue [its] efforts to re-establish accountability and oversight over the GGRF, which is riddled with self-

---

[12] *Id.*

[13] EPA Formally Refers Financial Management of $20B "Gold Bars" to Inspector General, EPA (last updated Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.

dealing, conflicts of interest, extraordinarily unqualified recipients, improperly reduced government oversight, and much more."[14]

75.    On March 3, 2025, NCN followed up with Citibank again, asking about "the freeze Citi has placed on the NCN CCIA account." NCN noted that Citi had provided no reasoning for the action and that the freeze was causing harm to the company. Citibank responded: "We are in receipt of your correspondence and will forward it to the United States Environmental Protection Agency and other federal officials for an appropriate response. Once we have further information available we can provide at that time." NCN never received further response or information from Citibank.

76.    On March 4, 2025, the Treasury Department, at the direction of EPA, instructed Citibank not to disburse any further GGRF funds until March 9. In an email to Citibank at 10:02PM, Treasury stated that "Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025." [15] That same day, NCN and the other grantees received a letter from EPA Deputy Administrator McIntosh expressing EPA's concern about oversight mechanisms in the program. Also that same day, March 4, Administrator Zeldin announced on social media: "The money is now FROZEN and DOJ/FBI is investigating."[16]

---

[14] Exhibit 6 to Citibank's TRO Opposition, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (Mar. 12, 2025), Dkt. 14-6.

[15] Exhibit 7 to Citibank's TRO Opposition, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (Mar. 12, 2025), Dkt. 14-7.

[16] Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM), https://perma.cc/J8Q5-B6A4.

77.     On March 10, 2025, EPA directed Citibank to continue to refrain from processing payments. The message stated: "In its communication to the Bank this week, the U.S. Department of the Treasury (Treasury) directed the Bank to cooperate with EPA on account controls. To prevent the misuse of funds in the interim, EPA instructs the Bank, pursuant to this Treasury directive, the grant agreements, and Section I.B of Exhibit A to the [FAA], to pause the processing of payment instructions for the GGRF accounts until further notice."[17]

78.     Meanwhile, on March 8, 2025, one of the NCIF grantees, Climate United, filed suit in the District Court for the District of Columbia. On March 10, Climate United moved for a temporary restraining order (TRO) to, among other things, enjoin EPA from terminating its grant,[18] and the district court scheduled an emergency hearing for March 11. The government, however, requested to postpone the hearing until March 12, and Climate United consented. *See Climate United Fund v. Citibank*, *N.A.*, 778 F. Supp. 3d 90, 103 (D.D.C. 2025).

79.     With the TRO hearing postponed to the next day, on the evening of March 11, EPA sent to all NCIF and CCIA grantees, including NCN, a "Notice of Termination." The notices sent to the grantees were all materially identical, stating

> [p]ursuant to [its] authority under 2 C.F.R. §§ 200.339–40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information . . . .

80.     The notice also stated that the "termination is based on substantial concern regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals

---

[17] Exhibit 2 to Citibank's TRO Opposition, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (Mar. 12, 2025), Dkt. 14-2.

[18] Mot. for Temporary Restraining Order, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (Mar. 10, 2025), Dkt. 2.

and statutory objectives of the award." The notice did not identify any legal or factual basis for terminating the grant on these grounds.

81.    The notice also stated that EPA has identified certain deficiencies, such as "the absence of adequate oversight and account controls," "allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and the "circumvention and defeat of key oversight mechanisms." The notice did not substantiate these concerns or identify any legal or factual basis for terminating the grant on these grounds.

82.    Finally, the notice asserted that EPA has "determined that its existing process for awarding and overseeing execution of the Grant Agreement" may violate the "Appointments Clause and private nondelegation doctrine." The notice did not explain any legal or factual basis for terminating the grant on these grounds, and EPA has not raised this theory as a defense for its actions in the ongoing federal court litigation.

83.    By press release dated March 11, 2025, EPA confirmed that it had "notified National Clean Investment Fund and Clean Communities Investment Accelerator recipients of the termination of their grant agreements." [19]

## I.    The Proceedings in *Climate United*

84.    On March 18, 2025, the district court in *Climate United* issued a TRO, which (among other things) enjoined EPA "from giving effect to EPA Defendants' Termination Letter, pending a determination on the merits" and from "transmitting or taking action to implement the termination of [the *Climate United*] Plaintiffs' grants, including taking action that results in the transfer, re-obligation, or re-allocation of the grant funds in Plaintiffs' Citibank accounts, or

---

[19] *See* Press Release, EPA Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-terminates-biden-harris-20b-gold-bar-grants.

issuing a Notice of Exclusive Control under its agreements[.]" *Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 335, 352 (D.D.C. Mar. 18, 2025).

85.     The *Climate United* plaintiffs then moved for a preliminary injunction. In its opposition, EPA conceded that EPA "did not terminate for Plaintiffs' noncompliance" with the grant agreements or any other "conduct of Plaintiffs."[20] Rather, EPA said that it terminated the contract based on its "assessment of the agency's priorities."[21]

86.     On April 15, the district court entered a preliminary injunction. *See* Dkt. 80 in *Climate United*, No. 25-cv-698 (D.D.C. Apr. 15, 2025). As to the plaintiffs in the case, the injunction enjoined the government from effectuating EPA's March 11 notice of termination, unlawfully suspending or terminating the plaintiffs' grant awards, and causing Citibank to limit the plaintiffs' access to grant funds. The injunction also enjoined Citibank from transferring funds out of the plaintiffs' accounts.

87.     The government filed a notice of appeal and moved for a stay from the D.C. Circuit. On April 16, 2025, the D.C. Circuit administratively stayed the district court's preliminary injunction insofar as it "enables or requires Citibank to release, disburse, transfer, otherwise move, or allow access to funds." *See* Order in *Climate Untied*, No. 25-5122 (D.C. Cir. Apr. 16, 2025). The court further ordered that "no party take any action, directly or indirectly, with regard to the disputed contracts, grants, awards[,] or funds." *Id.*

88.     On appeal, the government argued (as it had at the district court) that the Tucker Act stripped the district court of jurisdiction over the plaintiffs' claims. The government noted that "Congress has assigned the Court of Federal Claims exclusive jurisdiction to address

---

[20] Gov't Opp. To Mot. for Prelim. Inj. at 34–35, *Climate United v. Citibank*, No. 25-cv-698 (D.D.C. Mar. 26, 2026), Dkt. 49.
[21] *Id.* at 11.

assertions that the government has not honored the terms of its contracts and owes money to private parties as a result."[22] And it argued that the "plaintiffs' claims fall squarely within the Tucker Act, as this is a contract case through and through."[23] The government elaborated in subsequent *en banc* briefing that there could be no dispute "that the grant agreements are contracts within the meaning of 28 U.S.C. § 1491(a)," because "the Supreme Court's recent stay orders are premised on the understanding that these kinds of grant agreements are contracts."[24] The Supreme Court stay orders referenced were the court's decisions in *Department of Education v. California*, 604 U.S. 650 (2025), and *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), which stayed district court injunctions against grant terminations, with the Supreme Court holding that the claims were likely channeled to the Court of Federal Claims.

89.     On September 2, 2025, a panel of the D.C. Circuit issued an opinion vacating the district court's preliminary injunction. *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025). The panel held that the grantees' Administrative Procedure Act claims were "essentially contractual" and therefore "jurisdiction lies exclusively in the Court of Federal Claims." *Id.* at 816. On December 17, 2025, the full D.C. Circuit vacated the panel's judgment and ordered rehearing *en banc*. The *en banc* proceedings remain pending.

90.     NCN is not a party to the *Climate United* ligation or any other litigation pre-dating this case regarding the termination of NCN's CCIA grant.

---

[22] EPA Br. 18, *Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir. May 5, 2025).
[23] *Id.* at 21.
[24] EPA En Banc Br. 28 n.3, *Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir. Jan. 9, 2026).

**J.    NCN Disputes the Termination, Hears Nothing for Over a Year, and Then Submits Closeout Paperwork**

91.    On April 9, 2025, NCN submitted an administrative appeal and dispute of the termination to EPA. In the nearly one year since NCN submitted that administrative appeal, it has received no outreach from EPA regarding the appeal, let alone any information on whether and when the appeal would be considered.

92.    NCN followed up with EPA on April 29, 2025, and again on August 27, 2025, asking for an update on the status of the dispute. EPA did not respond.

93.    NCN likewise received no further outreach from Citibank since the bank stated on March 3, 2025 that it would provide more information to NCN about the freeze on its accounts once it became available. Meanwhile, all of NCN's funds in its Citibank accounts have remained frozen. NCN can view its account balances and see that the funds remain in the accounts, but it cannot access, transfer, or otherwise use the funds, due to EPA's instructions to Citibank.

94.    Having heard nothing from EPA or Citibank in over a year, on April 13, 2026, NCN sent EPA a letter indicating that it was proceeding with closeout and seeking damages for EPA's breaches of contract. NCN submitted all required closeout paperwork, including its "final report" that contains NCN's "investment strategy for . . .  its use of Post-Closeout Program Income over the Closeout Period." Ex. 3 at 16. NCN withdrew its administrative appeal and requested that EPA immediately complete closeout of the award. NCN also demanded that EPA instruct Citibank to unfreeze NCN's account to permit NCN to access and transfer the funds. On information and belief, as of the filing of this complaint, EPA has not responded to NCN's letter or taken any steps in response to the letter, including the steps that NCN requested.

95.    Nevertheless, under the terms of the Grant Agreement, the Closeout Agreement has gone into effect, the money in NCN's Budget Account at Citibank has become Post-Closeout

Program Income that NCN may keep and use, and NCN is "entitled to transfer any remaining funds in the Deposit Account [at Citibank] to an account at a financial institution of its choosing." *Id.* at 44, 58.

**K.    EPA's Unlawful Termination Causes Substantial Damages to NCN**

96.    NCN has suffered substantial damages as a result of the government's actions, including but not limited to its breaches of contract.

97.    The government has committed multiple independent breaches of contract. For instance, the government breached the Grant Agreement in terminating the grant for reasons not allowed for under the agreement, and the government has separately breached the Closeout Agreement in precluding NCN's access to, and use of, the funds in its Citibank account. Each of those breaches has independently deprived NCN of the $400 million in its Citibank account. That amount is the benefit of the bargain that NCN would have received but for the government's breach of the Grant Agreement (in impermissibly terminating the award), and the amount that NCN would have received but for the government's breach of the Closeout Agreement (post-termination).

98.    As a result of the government's actions, NCN has also been deprived of additional Program Income to which it would have been entitled under the Grant Agreement, including, for example, "origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance . . . ; interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award."

99.    NCN also incurred significant expenses in reliance on the government holding up its end of the bargain under the grant agreement. For example, NCN hired additional staff in

reliance on the grant agreement, and has also incurred consultant and legal fees in reliance on the grant.

100.    The government's actions have also harmed NCN's reputation. In reliance on the grant, NCN recruited 63 community lenders to participate in the CCIA-funded program, and also worked closely with coalition partners who were to help NCN implement its grant. EPA's preventing NCN from working with those lenders and partners, and EPA's unfounded accusations of "waste, fraud, or abuse," have damaged NCN's reputation and its relationship with these companies.

101.    Finally, EPA's depriving NCN of access to and use of its funds has directly prevented NCN from leveraging those funds to raise additional capital, as NCN would have done but for the government's actions.

## CAUSES OF ACTION

### Count One
### (Breach of Contract – Closeout Agreement)

102.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

103.    NCN's Closeout Agreement with EPA is a valid and enforceable contract.

104.    The Closeout Agreement went into effect on the earlier of "1) the day after the Assistance Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official." Ex. 3 at 44.

105. Given that all required work of the Federal award has been completed, and that NCN has submitted all required documents and information for closeout, the first and second triggers for the Closeout Agreement have each been met. *See also* Ex. 3 at 43. Accordingly, the Closeout Agreement is in effect.

106. "Once the Closeout Agreement goes into effect," NCN is "entitled to transfer any remaining funds in the Deposit Account [at Citibank] to an account at a financial institution of its choosing." *Id.* at 58.

107. The Closeout Agreement further provides that "after the end of the Period of Performance of the Assistance Agreement, [NCN] may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition." *Id.* at 44. The funds in NCN's Citibank account were Program Income at the end of period of performance, *id.* at 55–56, and became Post-Closeout Program Income as soon as the period of performance ended, *id.* at 10.

108. By preventing NCN from accessing and using the funds in its Citibank account, EPA has prevented NCN from "transferring [the] remaining funds in the Deposit Account [at Citibank] to an account at a financial institution of its choosing" and from "keep[ing] and us[ing] Program Income" in accordance with the Closeout Agreement. The government has thus breached the Closeout Agreement.

109. In the alternative, if the Closeout Agreement has somehow not yet taken effect, EPA has breached the Grant Agreement by not yet closing out the award. *See* Ex. 3 at 44.

110. As a result of EPA's breach of contract, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Two**
**(Breach of Contract – Unauthorized Termination)**

111.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

112.    The Grant Agreement is a valid and enforceable contract.

113.    The Grant Agreement authorized EPA to terminate only "as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination." Ex. 3 at 43.

114.    None of these conditions is met here. NCN complied fully with all the terms and conditions of the Grant Agreement, and EPA has never alleged otherwise. NCN has not engaged in waste, fraud, material misrepresentation of its eligibility status, or abuse, and EPA has never alleged otherwise.

115.    The government has conceded in the *Climate United* litigation that the CCIA grant terminations were not due to any noncompliance by NCN or the other grantees.

116.    EPA has asserted in the *Climate United* litigation that the CCIA grant terminations were based on EPA's purported policy priorities. But the Grant Agreement with NCN did not permit EPA to terminate the grant on the ground it no longer effectuated program goals or agency priorities, because that potential ground for termination was not "clearly and unambiguously" set forth in the Grant Agreement. 2 C.F.R. §§ 200.340(a)(4)–(b) (2024); *see also* 89 Fed. Reg. at 55263 (explaining that, as of July 3, 3024, EPA could "terminate a Federal award if it no longer effectuates the program goals or agency priorities (e.g. unilateral

30

termination) but only when such language is clearly and unambiguously included in the terms and conditions of the award").

117.    Because EPA did not and cannot cite a valid basis for termination under the terms and conditions of the Grant Agreement, EPA's unilateral termination of the Grant Agreement constitutes a breach of contract.

118.    As a result of EPA's breach of contract, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Three**
**(Breach of Contract – Unauthorized Control of Accounts)**

119.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

120.    The Grant Agreement is a valid and enforceable contract.

121.    The Grant Agreement authorized the government to exercise control over NCN's Citibank accounts only by furnishing a Notice of Exclusive Control, which requires a "written determination and finding that [NCN] has failed to comply with the terms and conditions of th[e] Award Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Award Agreement." Ex. 3 at 58.

122.    The government has not furnished to Citibank or Notice of Exclusive Control or issued a written determination as required by the Grant Agreement

123.    The government has exercised control over NCN's Citibank accounts by directing Citibank not to disburse funds in NCN's accounts and to pause the processing of payment instructions for those accounts.

124.    The government's unauthorized exercise of control of NCN's accounts constitutes a breach of contract.

125.    As a result of the government's breach of contract, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Four**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

126.    "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 205 (1981)). Courts have "long applied those principles to contracts with the federal government." *Id.*

127.    The covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1238, 1304 (Fed. Cir. 2005)).

128.    Where a contract confers discretion on a party, the implied covenant of good faith and fair dealing "limits the manner in which [the] party . . . may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705–06 (1996) (citation omitted); *see also Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 638 (2020) (plaintiff's "allegations of arbitrary and capricious agency conduct" supported its "claim for breach of the implied duty of good faith and

fair dealing"). This requires that an exercise of discretion "be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power." *Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800–01 (1993).

129.    EPA has violated the duty of good faith and fair dealing both with respect to the Grant Agreement (in terminating the award) and with respect to the Closeout Agreement.

130.    EPA acted to destroy NCN's reasonable expectations when entering into the Grant Agreement. NCN could not have reasonably expected that EPA would unilaterally terminate the award just months after approval, with no individualized consideration of NCN's award or circumstances—as part of a mass termination of *all* NCIF and CCIA awards in order to nullify a congressionally mandated program.

131.    EPA also acted arbitrarily and capriciously in terminating NCN's award, in directing Citibank to deny NCN access to its funds, and in continuing to cause NCN to lack such access even after NCN has submitted all required closeout materials. The government has not provided reasoned explanations for its decisions, considered alternatives to its actions, acknowledged its abrupt change of positions, or addressed the strong reliance interests of NCN and others. The arbitrary and capricious nature of the government actions is further underscored by the many procedural anomalies in its actions, including the political pressure and intervention to pursue a criminal case regarding the NFIC and CCIA awards (despite the lead career prosecutor insisting that there were no grounds for such an investigation), the government's reliance on a secretly recorded video of a former EPA staff member that had nothing to do with NCN's award, and the government's rush to terminate the NCIF and CCIA awards after securing a 24-hour extension for a TRO hearing about whether to enjoin the terminations.

132.    Accordingly, EPA breached the implied covenant of good faith and fair dealing attached to the Grant Agreement and the Closeout Agreement. As a result of such breach, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Five**
**(Abuse of Discretion)**

133.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

134.    "The cases are legion establishing that where a contract affords discretion to the government, exercise of that discretion must be fair and reasonable, not arbitrary and capricious." *Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020). Thus, even where a contract gives an agency wide discretion in terminating a contract, the government breaches a contract where it abuses its discretion in carrying out a termination. *JKB Sols. & Servs., LLC v. United States*, 18 F.4th 704, 709 (Fed. Cir. 2021). And the government abuses its discretion where "the contracting officer's decision to terminate was arbitrary and capricious." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 361 (2013).

135.    To the extent that the government had discretion to unilaterally terminate NCN's grant, to direct Citibank to deny NCN access to its funds, and to continue to cause NCN to lack such access even after NCN has submitted all required closeout materials, the government has abused that discretion.

136.    The government has abused its discretion in taking these actions with no individualized consideration of NCN's award or circumstances—as part of a mass termination of *all* NCIF and CCIA GGRF awards and an indiscriminate freeze of all of the grantees' funds in their Citibank accounts, in order to nullify a congressionally mandated program.

34

137.    The government's actions are further an abuse of discretion, and thus arbitrary and capricious, because the government has not provided reasoned explanations for its decisions, considered alternatives to its actions, acknowledged its abrupt change of positions, or addressed the strong reliance interests of NCN and others. The arbitrary and capricious nature of the government actions is further underscored by the many procedural anomalies in its actions, including the political pressure and intervention to pursue a criminal case regarding the NFIC and CCIA awards (despite the lead career prosecutor insisting that there were no grounds for such an investigation), the government's reliance on a secretly recorded video of a former EPA staff member that had nothing to NCN's award, and the government rush to terminate the NCIF and CCI awards after securing a 24-hour extension for a TRO hearing about whether to enjoin the terminations.

138.    Accordingly, EPA breached the contract in abusing its discretion in terminating the award.

139.    As a result of such breach, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

<strong>Count Six<br>(Termination in Bad Faith)</strong>

140.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

141.    "It is an established principle that the government is not permitted to terminate a contract in bad faith." *Irwin Cnty. v. United States*, 170 Fed. Cl. 355, 370 (2024). "Bad faith" includes "any conduct that evinces a 'specific intent to injure' and 'animus' toward the opposing party in terminating the contract." *Id.*; *see also Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118 (2016) (bad faith includes "specific intent to injure" or "animus").

142.    The administration has made it a priority to terminate thousands of awards issued by the prior administration *en masse*, and has specifically targeted organizations seeking to reduce greenhouse gas emissions. *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 103 (D.D.C. 2025).

143.    As set forth above, EPA abruptly terminated NCN's award and froze NCN's funds in connection with a pretextual criminal investigation. EPA did not provide NCN with any particularized reasons for terminating the award and directing Citibank to deny NCN access to its funds, but rather took these actions for every other NCIF and CCIA grantee for pretextual reasons.

144.    In announcing these actions, EPA described the terminated awards (including NCN's) as a "Gold Bar Grants" and Administrator Zeldin referred to the NCIF and CCIA programs as a "$20 billion 'gold bar' scheme," a reference to the secretly recorded video of a former EPA staff member that had nothing to do with NCN's award.[25] Zeldin also described "these grants" as "riddled with self-dealing and wasteful spending," and he claimed "misconduct, conflicts of interest, and potential fraud" in connection with the grants. Zeldin cited no evidence for these allegations, and there is none.

145.    The unfounded, reputation-damaging accusations against NCN and the other recipients reflect the government's animus toward—and intent to injure—NCN and the other NCIF and CCIA recipients.

146.    The government thus acted in bad faith in terminating NCN's grant and depriving NCN of access to its funds in its Citibank accounts.

---

[25] *Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants*, Mar. 11, 2025, https://www.epa.gov/newsreleases/administrator-zeldin-terminates-biden-harris-20b-gold-bar-grants.

147.    As a result of the government's actions, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

### Count Seven
### (Illegal Exaction)

148.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

149.    The government's termination of the Grant Agreement and causing Citibank to freeze NCN's funds and deny NCN access to those funds constitute an illegal exaction. The funds, over which NCN has title, have been "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Flynn v. United States*, 180 Fed. Cl. 256, 261 (2026) (quoting *Christy, Inc. v. United States*, 971 F.3d 1332, 1336 (Fed. Cir. 2020)).

150.    The government's actions violate the Constitution, a statute, *and* a regulation, any one of which suffices to demonstrate an illegal execution.

151.    First, the government's actions violate applicable regulations. EPA's initial suspension of the award, and corresponding direction to Citibank to freeze the account pre-termination, violated 2 C.F.R. § 200.339 (as incorporated into EPA's regulations), as that provision permits suspensions only where a grantee "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA's termination of the grant, and corresponding continued direction to Citibank to deny NCN access to its funds, violated 2 C.F.R. § 200.340 (as incorporated into EPA's regulations), because EPA terminated on grounds that are not among the permissible grounds for termination under § 200.340. And EPA's failure to close out the award, and corresponding failure to provide NCN accounts to its

Post-Closeout Program Income, violates 2 C.F.R. § 200.344 (as incorporated into EPA's regulations).

152.    Second, the government's actions violate the Inflation Reduction Act. In § 60103 of the IRA, Congress required EPA to obligate the full amount of appropriations provided for Greenhouse Gas Reduction Fund award, for carrying out the purposes Congress specified in the section. Because the deadline for EPA to obligate the funds expired on September 30, 2024, EPA's termination of NCN's award and the other CCIA and NCIF awards meant that the funds could not be re-obligated and would go unspent, contrary to the statute's requirements. EPA unlawfully used the terminations to repeal the Greenhouse Gas Reduction Fund program that Congress established and mandated.

153.    Third, the government's termination of NCN's award and directing Citibank to deny NCN access to its funds violate the Administrative Procedure Act, including because those actions are arbitrary and capricious. EPA has offered no evidence in support of its purported grounds for termination. Nor has the government provided reasoned explanations for its decisions, considered alternatives to its actions, acknowledged its abrupt change of positions, or addressed the strong reliance interests of NCN and others. The arbitrary and capricious nature of the government actions is further underscored by the many procedural anomalies in its actions, including the political pressure and intervention to pursue a criminal case regarding the NFIC and CCIA awards (despite the lead career prosecutor insisting that there were no grounds for such an investigation), the government's reliance on a secretly recorded video of a former EPA staff member that had nothing to NCN's award, and the government rush to terminate the NCIF and CCI awards after securing a 24-hour extension for a TRO hearing about whether to enjoin the terminations.

154.    Fourth, the government's termination of NCN's award and directing Citibank to deny NCN access to its funds violate the Due Process Clause of the Fifth Amendment. The government took these actions without providing NCN any notice and opportunity to be heard, and the government continues to deny NCN any meaningful opportunity to be heard. EPA has simply ignored NCN's repeated inquiries, it took no action on NCN's administrative appeal that was pending for roughly a year, and it has provided an ever-shifting set of explanations for its actions, including some that are based on unfounded speculation and inferences from a secretly recorded video from a former EPA staff member. *See Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 3d 335, 346 (D.D.C. 2025) (holding that Climate United was likely to succeed in showing due process violation).

155.    As a result of the government's illegal actions, the government has exacted NCN's private property and property interests—namely, the money in NCN's own bank account. The government's actions have had a direct and substantial impact on NCN and the exaction occurred as a direct result of the unlawful government action.

156.    NCN is entitled to recover for the government's exaction of its property and property rights, including the full amount of funds in its Citibank accounts.

157.    As a result of the government's actions, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Eight**
**(Taking Without Just Compensation)**

158.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

159.    The Takings Clause of the Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth

Amendment protects property owners from, and requires just compensation for physical takings, whether permanent or temporary.

160.    NCN has a valid, protected, and legally cognizable property interest and property rights in the funds held in its Citibank accounts. However, NCN has been denied access to, and use of, its property for more than a year, as a result of the government's directing Citibank to deny NCN access to its funds. The government's actions constitute a taking because the "invasion of [NCN's] property rights is chargeable to the government. *Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1024 (Fed. Cir. 2024) (quotations omitted).

161.    The government's termination of the Grant Agreement and instructions directing Citibank to deny NCN access to its funds constitutes a taking of NCN's private property and property rights for public use without just compensation, in violation of the Fifth Amendment.

162.    The government's termination of the Grant Agreement and instructions directing Citibank to freeze NCN's funds constitute a compensable physical taking because they have effected a government-authorized physical invasion, occupation, or appropriation of NCN's private property, for the government itself or for third parties.

163.    The Constitution requires just compensation for the taking.

164.    The government has not provided just compensation for the taking of NCN's property and property rights.

165.    NCN is entitled to full and just compensation for the government's taking of its property and property rights, including the full amount of funds remaining in its Citibank accounts.

166.    As a result of the government's actions, NCN has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

40

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of NCN and against the United States in the amount of NCN's damages, or such other amount as to be proven at trial, as well as costs, fees, interest, and such further and other relief as the Court deems just and proper. Plaintiff further requests that this Court order the United States to return NCN's funds that have been illegally exacted.

Dated: May 4, 2026                                                  Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson
John Robinson
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiff*